**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONYA D. JONES,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:25-CV-2648<br><br>JUDGE SARA LIOI<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG<br><br>**REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Tonya D. Jones's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Ms. Jones seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Dec. 5, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In April 2024, Ms. Jones applied to the Social Security Administration (SSA) seeking a period of disability, DIB benefits, and SSI benefits. (Tr. 233–37, 238–43, 244.)[1] She claimed that she became disabled on September 8, 2021. (*Id.*) She identified five allegedly disabling conditions:

[1] The administrative transcript appears at ECF No. 7. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 36"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 959").

(1) uncontrolled diabetes; (2) severe post-traumatic stress disorder; (3) leg trauma from a car accident; (4) “anger issues”; and (5) “learning problems.” (Tr. 288, 306.)

The SSA denied Ms. Jones’s application initially and upon reconsideration. (Tr. 84, 93, 95, 96, 104, 112, 113, 114.) Ms. Jones requested a hearing with an ALJ. (Tr. 147.) The ALJ held a hearing on June 5, 2025, at which Ms. Jones was represented by counsel. (Tr. 49–76.) Ms. Jones testified, as did an independent vocational expert (VE). (*Id.*)

On June 27, 2025, the ALJ issued a written decision finding that Ms. Jones was not disabled. (Tr. 14–36.) Ms. Jones sought review with the SSA Appeals Council (Tr. 230–32). The Appeals Council denied review in October 2025, rendering the ALJ’s decision the Commissioner’s final decision in the matter. (Tr. 1.)

On December 5, 2025, Ms. Jones filed her Complaint, challenging the Commissioner’s final decision that she is not disabled. (ECF No. 1.) Ms. Jones raises three assignments of error for review:

> **First Assignment of Error:** The ALJ erroneously dismissed the state agency experts’ limitation to “superficial” interaction with supervisors without sufficient explanation.
>
> **Second Assignment of Error:** The ALJ erred in failing to properly consider the supportability and consistency of a medical source opinion under 20 C.F.R. § 404.1520c.
>
> **Third Assignment of Error:** The ALJ relied on testimony from a vocational witness that did not properly account for the entirety of Ms. Jones’s physical and mental limitations.

(Pl.’s Merit Br. at 8, 10, 13, ECF No. 8, PageID# 959, 961, 964.)

## III. BACKGROUND[2]

### A. Personal, Educational, and Vocational Experience

Ms. Jones was born in August 1976 and was 48 years old on the date of her application. (Tr. 55, 238.) Ms. Jones earned her GED and attended some college courses. (Tr. 289, 307.) She has experience working in various manufacturing roles. (Tr. 58–60, 290.) She does not currently have a valid driver's license. (Tr. 56, 317.) She is widowed and has no children. (Tr. 830.)

Ms. Jones lives with her father and her father's wife. (Tr. 55.)

### B. Function Reports

When asked in a disability report form whether she could read and write simple messages, like a shopping list, Ms. Jones answered, "At times." (Tr. 290.)

In April 2024, Curtis Jones, Jr.—Ms. Jones's father—wrote a letter to SSA reporting that Ms. Jones is "incapable of handling money" as she will "let her so-called friend con her out of the money." (Tr. 286.)

In June 2024, Mr. Jones (the claimant's father) or Ms. Jones completed a function report in support of Ms. Jones's application. (Tr. 313–21.) The form is written from Ms. Jones's perspective but was signed by Mr. Jones. (*Id.*) According the function report, Ms. Jones has diabetes that is not under control, which causes her legs to become swollen and painful. (Tr. 313.) She has ulcers "all over [her] body." (*Id.*) And she is "not mental[l]y able to concentrate." (*Id.*)

The report notes that Ms. Jones has no problems seeing to her personal care. (Tr. 314.) But she needs reminders to shower and take her medicine. (Tr. 316.) She does not prepare meals or take care of household chores. (*Id.*) She watches television, but "very little." (Tr. 318.) She lives

[2] Ms. Jones confines her assignment of error to her mental health impairments and related limitations. (*See* Pl.'s Merits Br. at 8, 10, 13, ECF No. 8, PageID# 959, 961, 964.) Thus, I focus my summary on the evidence the parties have identified as related to Ms. Jones's mental health impairments and related limitations.

with friends and socializes "whenever possible," going with her friends to fast food restaurants. (Tr. 313, 318.)

Ms. Jones has problems getting along with others, because she is "loud and angry" when she gets "triggered." (Tr. 318.) She gets frustrated following written instructions, and she forgets spoken instructions. (Tr. 319.) She is argumentative with authority figures. (*Id.*) She does not handle stress or changes in routine well. (Tr. 320.) She wrote that she is tired, "lost," and "scared." (Tr. 321.)

## C. <u>Relevant Hearing Testimony</u>

### *1. Ms. Jones's Testimony*

Ms. Jones testified that she lives with her father, who supports her. (Tr. 55.) She does not work, but she volunteers helping out friends. (Tr. 55–56.) She mows the lawn for a friend that is going through health difficulties. (Tr. 56.) She sometimes watches others' pets. (*Id.*; *see also* Tr. 64.)

Ms. Jones described that she was assaulted with lye in the past, and the substance "melted her face." (Tr. 57; *see also* Tr. 62, 64–65.) Her friend was murdered shortly after the assault. (Tr. 65.) Now, Ms. Jones finds that she "can't really breathe" being around strangers. (Tr. 62.) She said that she worked on a manufacturing line for a few months after the attack, but her work required her to enter manufacturing ovens and aggravated the injury. (*See* Tr. 61.) She experienced pain "from [her] nose to [her] throat" and was vomiting from the pain. (*Id.*) She was sent home, and she was not able to return. (*Id.*)

Ms. Jones said that she would "love" to go back to work, but she does not believe she can work because she will need to take different kinds of insulin and check her blood sugars all day and will go on "physical and mental rants." (*See* Tr. 62.) She said she feels "like garbage." (*Id.*) She "can't seem to get out of bed every day," either from physical pain or otherwise. (Tr. 62–63.)

The ALJ at this point in the hearing noted that Ms. Jones was "yelling." (Tr. 63.) Ms. Jones said that she was not "trying to" but was "shaking" describing the "torture[]" of her assault. (*See id.*)

Ms. Jones testified that she sees a counselor, has been assigned a case manager, and should soon be seeing a psychiatrist to help treat her conditions. (Tr. 63.)

Ms. Jones said that she tries to do household chores, sometimes walks around the block, and rides a bike when she can. (Tr. 64.) But she finds herself sleeping a lot, and it is hard for her to "get up and out." (*Id.*) She takes two or three naps a day and finds it difficult to complete chores because she gets "winded" and exhausted. (Tr. 68.)

Ms. Jones testified that she is "trigger[ed]" into lashing out when she hears passive aggressiveness in others' voices. (Tr. 66.) She will start to tremble and shake, then she will "start ranting" and pacing, and then she will start sweating before becoming "manic." (Tr. 66–67.) She believes that she will have difficulty interacting with supervisors. (Tr. 67.)

At this point in the hearing, Ms. Jones said she was about to "go into a stupid [expletive] rant" and proceeded to describe how the lye "tortured" her and was never fully "neutralized." (Tr. 67.) She said that two weeks prior to the hearing, suspicious people tried to "pick her up"; she never knows if people are "still coming after [her]," and she feels mentally and physically exhausted. (Tr. 68.)

Ms. Jones testified that she has difficulties with attention and concentration and needs reminders to do things. (Tr. 69.) On a bad mental health day, she does not get out of bed. (*Id.*) In the month before the hearing, nearly every day was a bad day. (*Id.*) The two months before that, she was having bad days about once a week. (Tr. 69–70.)

### 2. *Vocational Expert's Testimony*

William Cody testified as a vocational expert (VE) at the hearing. (Tr. 70.) He classified Ms. Jones's past relevant work, follows: (1) Ms. Jones performed one job as an inspector (DOT 920.687-050), a semi-skilled (SVP 3), light-exertion job as generally performed but heavy as actually performed; and (2) Ms. Jones performed another job as a stacker (DOT 920.665-014), an unskilled (SVP 2), medium-exertion job as generally performed but heavy as actually performed. (Tr. 71.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Jones's age, education, and work experience had the capacity to perform work at any exertional level, with additional limitations. (Tr. 71–72.) Specifically, the person can perform work without a specific production rate pace (like assembly line work or with hourly production quotas). (Tr. 71.) The person can tolerate only occasional interactions with supervisors, coworkers, and the public. (Tr. 71–72.) They can only adapt to occasional changes in the workplace routine. (Tr. 72.)

The VE testified that such a person could not perform Ms. Jones's past relevant work but could perform the work of a store laborer (DOT 922.687-058), packer (DOT 920.587-018), or hospital cleaner (DOT 323.687-010). (Tr. 72.)

The VE testified that up to one absence per month is tolerated in unskilled work activity. (Tr. 72–73.) The tolerance for off task behavior is below fifteen percent. (Tr. 73.)

Ms. Jones's counsel asked the VE to assume that a hypothetical person was unable to handle any interaction more extensive than "shallow or cursory types of interactions with supervisors." (Tr. 73.) The VE testified that some level of substantive interaction with supervisors is required, for instruction, changes in work activities, or criticism or constructive behavior interactions. (*Id.*) In response to counsel's further questions, the VE testified that a limitation to an

isolated or solitary work environment would be inconsistent with unskilled competitive employment. (Tr. 74.) If a worker required frequent redirection or repetition in order for them to complete their tasks during the workday, that would also be inconsistent with competitive employment. (*Id.*) And if the employee required extra breaks on top of an employer's regularly scheduled breaks, it would preclude sustained work activity if the result was that the employee was off task 15 percent or more of the workday. (Tr. 74–75.) The VE testified that there is a "short tolerance" for behavior involving emotional instability like lashing out or talking back, but the VE confirmed that if it were to occur 15 percent of the workday, that would be work preclusive. (Tr. 75.)

After the hearing, the ALJ requested that the VE complete an additional interrogatory identifying in more detail how he estimated available job numbers for the jobs of store laborer, packer, and hospital cleaner. (Tr. 365–67.) The VE responded with the additional information (Tr. 371), which was admitted into the record without objection. (Tr. 17, 372–73.)

**D. State Agency Consultants**

A disability examiner (Jennifer Nelson), a physician (W. Scott Bolz, M.D.), and a psychologist (Janet Souder, Psy.D.) reviewed Ms. Jones's claim at the initial review level in August 2024. (Tr. 77–96.)

Dr. Bolz opined that there was no evidence of a severe functional impairment stemming from Ms. Jones's physical conditions. (Tr. 79.)

Dr. Souder opined that Ms. Jones had a mild impairment with respect to her ability to understand, remember, or apply information, and moderate impairments with respect to her ability to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage herself. (Tr. 80.)

Dr. Souder limited Ms. Jones to "a learned routine of simple and occasional complex tasks, without fast paced production demands." (Tr. 82.) Dr. Souder explained that there had been some variability in the consulting examination mental status examination tasks, but Ms. Jones had remained attentive to the interview. (*Id.*) Dr. Souder further noted that Ms. Jones's mood fluctuations interfere with her residual abilities according to her activities of daily living and clinical course. (*Id.*)

Dr. Souder further opined that Ms. Jones is "capable of interacting on a superficial basis [with] the general public and coworkers (meaning interactions of a short duration for a specific purpose), but would be expected to struggle over time [with] more demanding social situations." (Tr. 83.) Dr. Souder explained that Ms. Jones's "stress tolerance appears diminished" and she "would likely respond poorly to close, over the shoulder supervision." (*Id.*)

Finally, Dr. Souder found Ms. Jones capable of "adapting to a structured and predictable work setting with infrequent changes in responsibilities and expectations." (*Id.*)

Dr. Souder broadly noted that her opinions were further supported by records showing that Ms. Jones's conditions were maintained with medication from her primary care providers and that Ms. Jones maintained herself in the community without recent specialized mental health treatment. (*Id.*)

Based on these opinions, the consultants determined that Ms. Jones could perform the work of a lacer (DOT 774.687-014), check weigher (DOT 737.687-026), or cuff folder (DOT 685.687-014) and was not disabled. (Tr. 84.)

In a letter to Ms. Jones explaining this decision, the Agency wrote that the medical evidence showed that she has mental and emotional impairments but "maintain[s] the capacity to think, act,

and communicate in [her] own interest" and is "able to perform routine tasks in a predictable setting." (Tr. 122.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Adam Myers), physician (Mehr Siddiqui, M.D.), and psychologist (Jeannine Abbott, Ph.D.) in October 2024. (Tr. 97–114.)

Dr. Siddiqui agreed with the initial level physical findings and wrote that those findings "continue to be supported and consistent with both the evidence received on initial, as well as information received on reconsideration . . . ." (Tr. 98–99.)

Dr. Abbott similarly agreed that the prior administrative mental health findings were supported by and consistent with the totality of the medical evidence. (Tr. 100, 103.)

Based on these opinions, the consultants agreed with the initial level findings that Ms. Jones could perform skilled or unskilled work at any exertional level, with the non-exertional limitations identified, and therefore that she was not disabled. (Tr. 104.)

In a letter to Ms. Jones explaining this decision, the Agency wrote that the medical evidence showed that she "may experience emotional problems at times" but is "able to think, communicate, and care for [her] own needs," get along with others, do her usual daily activities, and remember and follow basic instructions. (Tr. 142.)

**E. <u>Relevant Medical Evidence</u>**

Medical records reflect that Ms. Jones has sought treatment for physical complaints over the years, including for injuries sustained during alleged assaults. (*See, e.g.*, Tr. 689–99.) The records reflect that Ms. Jones has struggled with methamphetamine use and experienced periods of unstable housing and food instability. (*See, e.g.*, Tr. 464, 468, 491.) Mental status examinations from these appointments sometimes reflect anxiety (*see, e.g.*, Tr. 438, 449, 494, 479, 711), depression (*see* Tr. 491), or outbursts (*see, e.g.*, Tr. 425, 450, 497.) But they largely reflect normal

mood and behavior and intact judgment and insight. (*See, e.g.*, Tr. 384–85, 388, 397, 404, 407, 409, 411, 420, 421, 430, 434, 441, 444, 451, 459, 463, 466, 476, 481, 502, 506, 699.) Records reflect that Ms. Jones has been consistent over the years in reporting that she was forced to snort a "line" of what she believed was methamphetamine but which was actually lye, which caused her injuries. (*See, e.g.*, Tr. 475, 491.) Records also reflect that Ms. Jones had a mass from her neck surgically removed, a procedure that was accompanied by the ablation of terminates and an intranasal synechia release. (Tr. 475, 478.) She reported "[f]eeling better" after those procedures. (Tr. 471.)

Ms. Jones was started on a selective serotonin reuptake inhibitor at least as early as August 2022 (Tr. 491), but in March 2023 she said that she had stopped taking that medicine and was not interested in being on any depression medication. (Tr. 471.)

Medical records also reflect that Ms. Jones has diabetes mellitus, which has been poorly controlled. (*E.g.*, Tr. 386, 392, 464, 471, 488.) Ms. Jones reported that she entered into a coma in 2021, after which she has not been able to control her blood sugars. (Tr. 392) She entered acute renal failure after a hospitalization in early 2024, after which her medications were changed. (Tr. 395.)

Ms. Jones underwent a consulting evaluation with Jinhui Wang, Psy.D., on August 6, 2024, as part of her disability application. (Tr. 829.) Ms. Jones described that that she "panic[s]" and "freak[s] out"; when she gets angry, she "break[s] things." (Tr. 830.) She recounted that in 2021 she was forced to ingest lye, which "was eating [her] face for two and a half months." (Tr. 831.) She said that she had been "harassed" by the police department and expressed that people were "coming after [her]." (*Id.*) But she said that psychiatric medication had been helpful. (*Id.*)

Dr. Wang estimated Ms. Jones's intellectual functioning in the average range and diagnosed with Unspecified Trauma and Stressor-Related Disorder. (Tr 833.) On examination, Ms. Jones presented as cooperative with appropriate dress and grooming. (Tr. 832.) Her conversational speed was normal, her expressive language was intelligible, and she displayed no loose associations or flight of ideas. (*Id.*) But she did sometimes use "cussing words." (*Id.*) She appeared stressed and anxious, but there were no signs of hostility or aggressiveness observed. (*Id.*) She did not display eccentric behaviors or impulsivity. (*Id.*) There was no impairment in attention or concentration observed. (Tr. 833.) Her concentration and persistence appeared satisfactory, and she was able to remain on task and work at an adequate pace during the clinical interactions across the evaluation. (*Id.*)

As for functional limitations, Dr. Wang opined that Ms. Jones can be expected to be able to understand, remember, and carry out instructions in a work setting. (Tr. 834.) Dr. Wang opined that there were no impairments noted as to attention and concentration, persistence, and pace during the interview, but "[i]f her trauma-and-stressor-related symptoms . . . worsen, they could negatively impact this domain by interfering with her ability to focus and to concentrate." (*Id.*) Dr. Wang opined that Ms. Jones "maintained capacity" in the ability to respond appropriately to supervision and to coworkers in the work setting. (*Id.*) Finally, Dr. Wang opined that Ms. Jones's trauma-and-stressor-related symptoms "could lower her frustration tolerance and put her at risk for workplace pressure at this time." (*Id.*)

Ms. Jones underwent a behavioral health assessment with Lynelle Winkler, LPCC, via videoconference on October 8, 2024. (Tr. 911.) Ms. Jones recounted the incident with the lye and described how she feels it has affected her. (Tr. 912.) She said that she goes on rants because of trauma. (*Id.*) She said a "federal officer" had put a "hit" out on her and she is being followed all

the time. (*Id.*) She said her spouse passed away from ALS in 2018. (*Id.*) She described herself as a "vagabond" who "bounce[s] from place to place." (*Id.*) She identified other traumatic experiences that she had experienced in her life. (Tr. 913.) On examination, Ms. Jones presented as poorly groomed. (Tr. 916.) She had rapid and loud speech and manifested a labile affect. (*Id.*) Her insight and judgment were fair. (*Id.*) She had ruminations and a circumstantial, racing thought process. (*Id.*)

Ms. Jones presented for an initial psychiatric evaluation with Amanda Prince, PA, via a telehealth appointment on October 10, 2024. (Tr. 907.) Ms. Jones reported that she had been dealing with a severe increase in life stressors since 2021. (*Id.*) She said she feels anxious and fearful all the time and moves from place to place because she does not feel safe staying at any one place for very long. (*Id.*) She reported poor sleep and eating habits. (*Id.*) She again recounted the situation with the lye and said she had been "targeted" by others, including law enforcement, ever since. (*Id.*)

On examination, Ms. Jones reported being anxious. (Tr. 909.) But her speech, thought content, thought process, and perception were unremarkable. (*Id.*) Her memory was intact. (*Id.*) Ms. Prince diagnosed Ms. Jones with a severe episode of recurrent major depressive disorder, without psychotic features; post-traumatic stress disorder; generalized anxiety disorder; and mild cannabis and tobacco use disorders. (*Id.*) She was prescribed several different medications and referred for counseling. (*Id.*)

Ms. Jones met with Meghan Ayers, LISW, on November 7, 2024. (Tr. 905.) Ms. Jones discussed her trauma experiences and reported that she had been moving from place to place, staying with friends and her father. (*Id.*) On examination, she was anxious and hyperactive. (*Id.*) Her mood was nervous and anxious. (*Id.*)

Ms. Jones followed up with Ms. Ayers on January 20, 2025. (Tr. 902.) Ms. Ayers noted that Ms. Jones had made minimal improvement. (*Id.*) The same observation was noted at their follow up appointment on January 30, 2025. (*Id.*) But her mental status examination was within normal limits at that appointment. (*Id.*)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Jones meets the insured status requirements of the Social Security Act through March 31, 2027. (Tr. 20.) The ALJ next determined that Ms. Jones had not engaged in substantial gainful activity since September 8, 2021, the alleged onset date. (*Id.*)

The ALJ next determined that Ms. Jones had severe impairments of (1) post-traumatic stress disorder; (2) major depressive disorder; and (3) generalized anxiety disorder. (*Id.*) The ALJ found that Ms. Jones had non-severe impairments including obesity, diabetes mellitus, and a spinal impairment. (*Id.*) The ALJ stated that any limitations stemming from these impairments, both severe and non-severe, were incorporated into the residual functional capacity. (Tr. 22.)

The ALJ next determined that none of Ms. Jones's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Jones had the residual functional capacity ("RFC") to perform work at any exertional level with a number of additional limitations. (Tr. 27.) Specifically, she can work without a specific production rate pace (such as assembly line work or work requiring hourly production quotas). (*Id.*) She can tolerate occasional interaction with supervisors, coworkers, and the public. (*Id.*) And she can adapt to occasional changes in a workplace routine. (*Id.*)

The ALJ found that Ms. Jones is not able to perform her past relevant work as an inspector or stacker. (Tr. 34.) The ALJ concluded that Ms. Jones was 45 years old on the alleged disability

onset date and had at least a high school education. (*Id.*)

The ALJ then determined that, considering Ms. Jones's age, education, work experience, and RFC, she can perform other work that exists in significant numbers in the national economy, including the work of a store laborer (DOT 922.687-058), packer (DOT 920.587-018), or hospital cleaner (DOT 323.687-010). (Tr. 35.)

Accordingly, the ALJ determined that Ms. Jones is not disabled. (Tr. 35–36.)

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. <u>Standard for Disability</u>**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in

the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

***1. Superficial Interaction Limitation***

In her first assignment of error, Ms. Jones argues that the ALJ erred when crafting the RFC because the ALJ did not adequately account for the state psychologists' opinions that Ms. Jones is limited to superficial interaction with others. She points out that, at the initial review level, Dr. Souder opined that Ms. Jones is "capable of interacting on a superficial basis [with] the general public and coworkers (meaning interactions of a short duration for a specific purpose), but would be expected to struggle over time [with] more demanding social situations." (Tr. 83.) Dr. Souder further opined that Ms. Jones "would likely respond poorly to close, over the shoulder supervision." (*Id.*) At the reconsideration level, Dr. Abbott agreed. (Tr. 100, 103.)

The ALJ limited Ms. Jones to "occasional interaction with supervisors, coworkers, and the public," among other things. (Tr. 27.) Ms. Jones argues that the ALJ failed to account for the superficial limitation, which is significant, she says, a "superficial" limitation restricts the quality of interaction one can sustain, while an occasional interaction limitation only restricts the quality of interaction one can sustain. And she says that the ALJ failed to adequately explain his decision not to include a superficial limitation.

In discussing the opinions of the state agency consultants, the ALJ reasoned as follows:

> I find partially persuasive the prior administrative medical findings . . . . They [the state agency consulting psychologists] reviewed the claim at the initial and reconsideration level and opined that the claimant has mild limitations in understanding, remembering, or applying information, and moderate limitations in each of the other areas of mental functioning . . . and she can carry out simple and occasional complex tasks without fast paced production demands; she can tolerate superficial interactions with the general public and coworkers (i.e., short duration and for a specific purpose), and she would respond poorly to close, over-the-shoulder

> supervision; and she can adapt to a structured and predictable work setting with infrequent changes in responsibilities and expectations . . . . I find these opinions partially persuasive because the degrees of limitation are supported by the evidence the consultants reviewed (e.g., results of consultative examination . . .; agitation with nursing staff during hospitalization in February of 2024 . . .; examinations where her insight and judgment generally were intact . . .; examinations demonstrating anxiety . . . , and they are consistent with the more complete record.
>
> I find less persuasive the limitation on the complexity of tasks. Otherwise, with respect to specific mental functional limitations, I utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. While I did not adopt the state agency psychological consultants' opinions verbatim, I found the general theme of these specific limitations partially persuasive when formulating the above residual functional capacity assessment. Accordingly, these opinions are partially persuasive.

(Tr. 32) (line break added for readability) (internal citations to the record omitted).

The Commissioner defends the ALJ's decision, arguing that it is not improper for an ALJ to translate opined limitations into functionally relevant terms. He says it is clear from discussions earlier in the opinion that the ALJ found the consultants' opinions and social interaction limitations persuasive, but only to the extent that Ms. Jones is limited in "the **frequency** of interactions with others." (Tr. 32) (emphasis added). And he says the ALJ's decision not to include a limitation with respect to the quality of interactions with others was supported by substantial evidence.

After careful consideration, I agree with the Commissioner.

While the ALJ did not include the word "superficial" in the RFC, an ALJ is not required to adopt the verbatim wording of an opined limitation in the RFC finding. *E.g.*, *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

The first question, then, is whether the RFC here actually conflicted with the state consultants' opinions. There is good reason to conclude that it did not.

The term "superficial interaction" is not defined in the governing regulations. *See, e.g.*, *Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases). There is general—although not universal—agreement among the courts that a limitation to "superficial interaction" is a limitation on the depth or quality of one's interactions, as opposed to the frequency of interactions. *See, e.g.*, *Haahr v. Comm'r of Soc. Sec.*, No. 3:23 CV 2159, 2024 WL 5242214, at *3 (N.D. Ohio Dec. 30, 2024.)

But the consultants defined what they meant by "superficial" in this case. They meant "interactions of a short duration for a specific purpose." (Tr. 83.) They explained that, over time, Ms. Jones would struggle with "more demanding social situations," and they said that she would likely respond poorly to "close, over the shoulder supervision." (*Id.*)

Even if there is a meaningful distinction in the abstract between a superficial limitation and an occasional interaction limitation, the consultants in this case specifically defined "superficial" primarily in terms of the frequency of these interactions—"interactions of a short duration." And "occasional" interaction with supervisors would seem to preclude the kind of "close, over the shoulder supervision" with which Ms. Jones can be expected to struggle. And while the consultants limited Ms. Jones to interactions "for a specific purpose," in light of the combination of limitations in the RFC it is difficult to imagine the occasional limitation failing to encompass that vague restriction. *Cf. Stephen D. v. Comm'r of Soc. Sec.*, 734 F.Supp.3d 729, 738 (S.D. Ohio May 16, 2024) ("Assuming that 'occasionally' means limiting a claimant to jobs where he spends no more than one-third of his time performing work-related activities interacting with others likely also means he lacks time to interact socially on a non-superficial level.")

In other words, I do not view the ALJ's limitation to "occasional" interaction with others, especially in the context of the other limitations in the RFC, to be materially inconsistent with the agency consultants' opinions. The ALJ limited Ms. Jones to occasional interactions with others in the context of a work environment where there is no specific production rate pace and only occasional changes in a workplace routine. *See Stephen D.*, 734 F.Supp.3d at 738 ("[W]hen a person is limited to engaging in only short and infrequent interactions, that strongly correlates, as a practical matter, with interactions that are superficial, as well."); *see also Wieman v. Comm'r of Soc. Sec.*, No. 3:22 CV 1045, 2023 WL 5541597, at *3 (N.D. Ohio Aug. 29, 2023) ("[A] combination of restrictions . . . may sufficiently encompass the superficial interaction limitation.").

Indeed, it seems clear that the ALJ intended to embody the consultants' interaction limitation into the RFC. In describing why he found the opinions partially persuasive, the ALJ specifically pointed to the record showing agitation with nursing staff during a hospitalization in February of 2024 and examinations demonstrating anxiety. (Tr. 55.) The ALJ then discussed why he disagreed with their opinions about limitations on task complexity, before stating that "[o]therwise, with respect to specific mental functional limitations, I utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations." (*Id.*) He wrote that he "found the general theme of these specific limitations partially persuasive." (*Id.*)

For these reasons, I am convinced that the ALJ's RFC does not actually conflict with the opinions of the state agency consultants in this case. I therefore recommend that the Court overrule Ms. Jones's first assignment of error.

### 2. *Supportability and Consistency of Dr. Wang's Opinion*

In her second assignment of error, Ms. Jones argues that ALJ failed to adequately consider the supportability and consistency of Dr. Wang's August 2024 consulting opinion. She points out

the ALJ found Dr. Wang's opinion only partially persuasive, reasoning that the opinion was vague. Ms. Jones argues that it is improper for an ALJ to "dismiss a consultative examiner's clinical findings simply because they do not perfectly specif[y] a functional limitation that can be directly placed into the RFC."

The ALJ addressed Dr. Wang's opinion as follows:

> I find partially persuasive the opinion of consultative psychological examiner, Jinhui Wang, Psy.D., dated August 6, 2024, opining that the claimant has no difficulty with understanding, remembering, and carrying out instructions; she would have some difficulty with maintaining attention, concentration, persistence, or pace; she would have some difficulty interacting with others; and she has lowered frustration tolerance and would have difficulty tolerating work pressures in a work setting . . . .
>
> I find this opinion partially persuasive because it generally is supported by the consultant's examination of the claimant, although the findings demonstrate mild limitations in understanding, remembering, or applying information: her speech was unremarkable aside from cussing; she was well-groomed; her thought content was otherwise normal; she appeared stressed and anxious, and her affect was congruent; she was alert and fully oriented; she tracked the conversation flow and did not display apparent issues with understanding and remembering; she was neither distracted nor did she have impaired attention or concentration; she could remain on task and work at an adequate pace on tasks; she spelled "world" correctly forward but not backward; she could not perform serial 3s; she could do addition but not multiplication; she recalled the last five presidents; her intellectual functioning as assessed as average; and her insight and judgment were unremarkable . . . .
>
> However, the opinion is vague in its description of the degree of limitation the claimant would experience, and it does not address the claimant's residual functioning. The opinion generally is consistent with the other evidence insofar as it suggests that the claimant has lesser residual functional limitations in understanding, remembering, or applying information than in other areas of work-related mental functioning (e.g., the state agency psychological consultants' opinions). Accordingly, this opinion is partially persuasive.

(Tr. 32–33) (line breaks added for readability) (internal citations to the record omitted).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2).

The Commissioner defends the ALJ's reasoning, pointing out that the ALJ discussed supportability by noting that the opinion was "generally supported by the consultant's examination" and identifying specific examination findings. The Commissioner argues that the

ALJ discussed consistency by noting that the opinion was "generally . . . consistent with the other evidence . . . ." And the Commissioner argues that the ALJ properly concluded that the opinion was vague.

I again agree with the Commissioner.

As an initial matter, perhaps betraying the correctness of the ALJ's analysis, Ms. Jones does not identify a specific functional limitation that she wishes had been included in the RFC based on Dr. Wang's opinion. At best, she argues that Dr. Wang's clinical findings support the functional limitations opined by *other* doctors. (*See* Pl.'s Merits Br. at 11, ECF No. 8, PageID# 963.)

Contrary to Ms. Jones's arguments here, an ALJ does not err even in deciding to give little weight to an opinion, where the opinion is "vague" and does "not actually propose any specific functional limitations." *E.g.*, *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018); *see also Edwards v. Comm'r of Soc. Sec.*, No. 23-5490, 2024 WL 2705000, at *2 (6th Cir. Feb. 12, 2024) (affirming where a consulting opinion noted that a claimant's work skills were "compromised" by their mental health systems but otherwise "provided no function by function assessment regarding the nature and degree to which [the claimant] was 'compromised' with regard to her abilities and limitations for performing various types of occupations or basic work activities.").

Here, despite the vagueness of Dr. Wang's opinion, the ALJ credited much of that opinion. The ALJ in fact found that Dr. Wang's clinical findings support a *greater* degree of limitation in one area of functioning than Dr. Wang had found. The ALJ noted that Dr. Wang found no limitation with respect to understanding, remembering, and carrying out instructions, but the ALJ found Dr. Wang's clinical findings actually supported a mild limitation in that domain. (Tr. 32–33.) The ALJ found the opinion to be generally supported by the consulting evaluation. *See Rattliff v. Comm'r*

*of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021), *report and recommendation adopted*, 2022 WL 627055 (holding that ALJ addressed supportability factor by comparing a physician's opinion with the physician's treating notes); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020) (same). And the ALJ found the opinion to be generally consistent with the other evidence in that Ms. Jones has functional limitations, less so with respect to her ability to understand, remember, or apply information than in other functional domains. (Tr. 33.)

The ALJ's reasoning with respect to Dr. Wang's opinion is further set out in his Step Two analysis:

> While these examinations show that the claimant's mental impairments impact the ability to interact with others to some degree, they do not show a significant or serious degree of impairment. After reviewing the medical evidence of record available to them, including some of the above mental status examination findings, . . . the consultative psychological examiner opined that the claimant would have some difficulty interacting with others . . . . I acknowledge that the claimant's mental impairments have impacted the ability to interact with others to some degree; however, the mental status examinations and the persuasive portions of the medical opinions do not support that the claimant experiences a significant or marked degree of limitation in interacting with others. The evidence of record establishes that the claimant's residual functional limitations are no worse than fair. Accordingly, I find that the claimant has moderate limitation in this area of functioning.

(Tr. 24.)

Among other specific treatment records identified, the ALJ at Step Two pointed to records from an August 2022 examination, Ms. Jones's 2024 hospitalization, her behavioral health assessments, and her counseling notes. (Tr. 23–24.)

Because the ALJ adequately addressed the supportability and consistency of Dr. Wang's opinion, citing to specific record evidence, and because Dr. Wang did not identify any specific

functional limitation more restrictive than the RFC ultimately adopted, I find that the ALJ's reasoning is adequate and his conclusions are supported by substantial evidence.

I therefore recommend that the Court overrule Ms. Jones's second assignment of error.

### 3. *Vocational Testimony and Step Five Conclusions*

Ms. Jones's final assignment of error follows on the first two assignments of errors. She argues that the ALJ failed to include all of her mental limitations in the hypothetical question posed to the VE at the hearing. Specifically, she argues that the ALJ did not properly account for Ms. Jones's limitation to superficial interaction with supervisors in posing the hypothetical question to the VE. Ms. Jones supports her argument by referring back to her first assignment of error. Ms. Jones argues that the error is not harmless because a superficial limitation may have altered what jobs, if any, would be available to her in the national economy.

At Step Five, the Commissioner must consider whether a claimant's residual functional capacity, age, education, and work experience would allow the claimant to "make an adjustment to other work" that "exists in significant numbers in the national economy." 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c)(2). The Commissioner bears the burden of proof at this final step and usually attempts to meet that burden through the testimony of a vocational expert who is posed a hypothetical question crafted by the administrative law judge. *Quisenberry*, 757 F. App'x at 424.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, (6th Cir. 2010).

Here, the ALJ asked the VE at the hearing to assume that a hypothetical individual with Ms. Jones's age, education, and work experience had the capacity to perform work at any exertional level, with additional limitations. (Tr. 71–72.) Specifically, the person can perform work without a specific production rate pace (like assembly line work or with hourly production quotas). (Tr. 71.) The person can tolerate only occasional interactions with supervisors, coworkers, and the public. (Tr. 71–72.) They can only adapt to occasional changes in the workplace routine. (Tr. 72.)

The VE testified that such a person could not perform Ms. Jones's past relevant work but could perform the work of a store laborer (DOT 922.687-058), packer (DOT 920.587-018), or hospital cleaner (DOT 323.687-010). (Tr. 72.)

The ALJ relied on this testimony at Step Five in concluding that Ms. Jones could perform those jobs and was not disabled. (Tr. 35.)

The Commissioner defends the ALJ's reliance on the VE's testimony, characterizing the hypothetical as accurate and comprehensive. He points out that all of the jobs cited by the vocational expert and relied upon by the ALJ are unskilled jobs, which "ordinarily involve dealing primarily with objects, rather than with data or people." SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).

I agree with the Commissioner that the ALJ did not err in relying on the VE's testimony here.

Ms. Jones essentially argues that, because the ALJ's conclusions with respect to the "superficial" limitation were not supported by substantial evidence, it was error for the ALJ not to include such a limitation in the hypothetical.

In addressing a similar argument, the Sixth Circuit has noted that, where the hypothetical tracks the language of the RFC, such an argument is essentially duplicative of an argument that the RFC itself did not include all limitations. *Quisenberry*, 757 F. App'x at 435.

For the reasons discussed at length above when discussing Ms. Jones's first assignment of error, the ALJ's RFC is consistent with the opinions of the state agency consultants based on their definition of "superficial," and the ALJ's conclusions are supported by substantial evidence.

Therefore, substantial evidence supports the determination of the ALJ that it was appropriate to rely on the VE's testimony in response to the hypothetical question, which tracked the language of the RFC, and to conclude that jobs appropriate for Ms. Jones's skills and limitations exist in significant numbers in the economy.

I therefore recommend that the Court overrule Ms. Jones's third assignment of error.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: October 13, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the

> basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).